33859.   HARRIS *v.* GILES.

Decided March 19, 1952.

*Milner & Stephens, Carlisle Cobb,* for plaintiff in error.
*Erwin, Nix, Birchmore & Epting,* contra.

Sutton, C. J.   H. C. Giles sued H. H. Harris for $3905, as the balance due on a construction contract, and also for the establishment of a special lien on the property of the defendant as improved by the plaintiff under said contract.   It was alleged in the petition: that the plaintiff and the defendant entered into a contract on June 15, 1950, by the terms of which the plaintiff was to construct a dwelling for the defendant in accordance with plans furnished by the defendant; that it was agreed that the defendant should pay to the plaintiff the actual cost of all labor and materials purchased for or used in the construction of such dwelling, plus fifteen percent of such construction cost, the payments to be made weekly as the bills for labor and materials accrued; that no written specifications of materials were furnished, but the defendant exercised his own discretion in selecting materials and equipment to be used in the construction of such dwelling; that it was agreed that the plaintiff should supervise the construction of said dwelling and the purchase and securing of labor and materials in connection therewith; that the plaintiff constructed the dwelling, acting in accordance with said agreement, by securing and furnishing the labor and materials for the dwelling and making such changes in the construction plans as were from time to time requested by the defendant, and has substantially completed the construction of said dwelling in accordance with his contract; that the defendant paid the bills rendered through November 17, 1950, and paid $1161 on a bill rendered December 8, 1950, but has refused to pay the remaining cost of the construction of said dwelling in the amount of $3905; that the plaintiff has fully performed his part of the contract insofar as performance was possible in view of certain changes made at the defendant's request; and that, on January 18, 1951,

the plaintiff filed his claim of lien against the defendant's property on which said improvements were constructed. A copy of the claim of lien thus filed and an itemized statement of the balance due under the contract were attached to the petition and made a part thereof.

The defendant answered, admitting the contract, but further alleging: that it was verbal; that the plaintiff was to construct the house at a cost between $11,000 and $12,000, including the commission to be paid to the plaintiff, and would complete the house before the end of September; that there were no written specifications of materials, but the defendant did not exercise his own discretion in selecting materials and equipment to be used, except in choosing the color of paint and floor tile to be used, at the instance of the plaintiff; that the plaintiff did not properly supervise the construction or purchase of materials so as to control the progress of construction; that the defendant denies owing the plaintiff any amount; that the defendant paid the plaintiff in full $15,578.61, for which sum the plaintiff has failed to furnish an accounting; that the house was not completed according to the agreement; and that the lien was filed as alleged.

The defendant further alleged in his answer: that, due to inability to obtain cement, the parties agreed on October 15, 1950, as a completion date; that on October 20, 1950, when the house was still incomplete, the parties entered into a new agreement that the plaintiff would complete the house by November 20, 1950, for the additional sum of $4500 on a "lock-and-key" basis, but the plaintiff has not complied with his part of the contract; that from June, 1950, until October 20, 1950, the defendant paid the plaintiff $11,078.61, and in compliance with the agreement of October 20, 1950, paid $4500 in addition, making a total payment to the plaintiff of $15,578.61; that the defendant also assumed on his own account the payment for the heating system of $1436, although this item was included in prices quoted for a complete house; that the defendant completed the construction of his house at the lowest possible cost of $1347, which was itemized; and that as a result of the plaintiff's breach of the contract, the defendant has been damaged in the sum of $2783.

The case was tried, and the jury returned a verdict in favor of the plaintiff for $3892.81 and a special lien on the property. The

defendant's motion for a new trial was overruled, and he excepted to that judgment.

1. The parties both concede that the controlling question in this case, insofar as the general grounds of the motion are concerned, is whether or not there was evidence to support a finding that the parties did not enter into a fixed-price, "lock-and-key" contract, on October 20, 1950, but rather continued the construction on the previous basis of cost of labor and materials plus a fifteen percent commission, as compensation for the supervision of the construction by the plaintiff. The jury, by finding in favor of the plaintiff, necessarily found against the contention of the defendant in this respect, and the defendant contends that the verdict is strongly and decidedly against the weight of the evidence.

The evidence supporting the verdict was as follows: In June, 1950, the parties agreed that the plaintiff was to construct a house according to plans furnished by the defendant. The defendant was to make weekly payments to the plaintiff as the work progressed for the labor and materials supplied by the plaintiff and fifteen percent of these amounts as a commission for the plaintiff. The plaintiff testified that he had told Harris before seeing the plans that "he should get out for around $12,000." When the house was about four-fifths completed, in October, the defendant had paid the plaintiff almost $12,000, and had to obtain more money for the work to proceed. The defendant, Harris, negotiated a loan of $4700 from the Hubert State Bank on October 20, 1950, in connection with which the plaintiff gave the bank a sworn statement to the effect that there was no outstanding indebtedness on his part against the property on which the house was being constructed, and also, "I further state a maximum amount of $4500 will complete fully the cost of construction of Mr. Harris' dwelling." The plaintiff, Giles, testified with respect to this statement: "If we had used the materials that we had in mind at that time, I am pretty sure the house could have been finished for that amount." The bills submitted by the plaintiff to the defendant on October 27, November 9, and November 17 each included the fifteen percent commission previously agreed upon, and were paid without question by the defendant. The bill for December 15 did not include

such commission. The plaintiff explained that the bill for that date would have been $2056.51, but was reduced to $1161, which was all Harris said he could then pay, until he secured another loan. This was the last payment made by the defendant, and, including the payment of October 20, 1950, made a total of almost $4500 paid on and after that date. The plaintiff continued working after December 15, 1950, and in January, 1951, the defendant applied for another loan, representing in the application that he was indebted to the plaintiff $2700. According to the plaintiff's testimony, it was in January, 1951, that he first heard that the contract had been changed to a fixed-price basis for the completed job.

The defendant testified that minor inside changes were made all during the construction, and that he was living next door and was at the job "once in a while, just every week end or during the week, both." It was undisputed that there were no written specifications as to the kind or quality of materials to be used in the house, either before or after October 20, 1950. The plaintiff's timekeeper, E. C. Nelson Jr., testified that, after November 1, the stairs to the doors on the north side of the building as shown on the plans were changed to a solid concrete slab porch, with steel columns underneath for support, which required forms to be made for the concrete; and that the den was changed from a plaster finish to Weltex plywood, at Harris's request, which was two to three times more expensive. Frank Mangoled, a carpenter on the job, testified that the change from knotty pine to Weltex plywood in the den called for changes in the framing structure, which he made. The plaintiff testified that the Weltex in the den was not put up in sheets as it came from the factory, but was cut into sixteen-inch squares, and, when put up, the squares were alternated, that is, turned in different directions, as requested by Harris. Sam Smith testified that he installed plastic tile over the painted plaster walls of the bathroom on order of Harris given not earlier than November 1, and also installed Versa-tile in the kitchen, as ordered by Harris, which cost $1.10 a square foot as against 42¢ a foot for linoleum. Robert C. Eckenrod, the electrical subcontractor, testified that in November and December he installed the lighting fixtures, which had been selected by Mr. and Mrs. Harris and shipped

to him in November. Giles also testified that the quality of the kitchen cabinets or the materials to be used in the cabinets had not been specified or agreed upon as of October 20, 1950.

It was stipulated that the bills set out in the exhibit attached to the petition had been incurred by the plaintiff in connection with the Harris job, and that Harris had paid the plaintiff a total of $15,578.61.

From this evidence, the jury was authorized to find that the plaintiff's statement on October 20, 1950, was a prediction or estimate that the cost of finishing the house as it stood on October 20, 1950, would be $4500, rather than a promise to complete the house for that amount. There was no evidence of any definite specifications that were agreed upon at that time; and, with regard to the plywood walls in the den, the kitchen cabinets and floors, the bathroom walls, and the electrical fixtures, it appeared that the defendant exercised his own discretion in choosing the type of materials to be used or in changing the plans as the work progressed. Such discretion in the owner to modify plans and specifications of materials is not ordinarily found in a fixed-price contract for a completed house, for, if this were true, the amount of profit or loss to the contractor would depend solely upon the whims of the owner. The defendant's admission of a $2700 indebtedness to the plaintiff as made in the loan application of January, 1951, also tends to support the jury's verdict, which was authorized by the evidence in the case.

2. In the special ground of the motion for a new trial, the defendant complains of the exclusion by the court of evidence that the plaintiff had once made a false affidavit that bills were paid on a construction job for one Woods. The defendant contended that such previous false statement on a similar occasion would show a motive and intent to defraud the defendant such as would tend to impeach the plaintiff's testimony. In his motion, the defendant contends that the evidence excluded was material to show a general scheme and motive to deceive the defendant, that is, to influence Harris, as Woods was influenced on some other contract, to part with his money, from which motive to deceive, the jury would have been authorized to disbelieve the plaintiff's testimony that he did not enter into a "lock-and-key," flat-price contract on October 20, 1950.

In order for such previous statements to be admissible for the purpose of impeachment, they must refer to matters relevant to the witness's testimony and to the case, and must contradict some matter testified to by such witness. The issue in the case at bar was whether or not the parties entered into a new contract on October 20, 1950, as above stated. It appears that the affidavit referred to in the Woods transaction was a separate and distinct matter and had nothing to do with the present case, and contradicted no testimony in this case. "The general character of the parties, and especially their conduct in other transactions, are irrelevant matter, unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct." Code, § 38-202. Motive and intent may be shown in civil cases involving questions of good or bad faith, but such an issue was not in the present case, and the trial judge properly excluded the proffered evidence referred to in the special ground of the motion.

3. The trial judge did not err in denying the defendant's motion for a new trial.

*Judgment affirmed. Felton and Worrill, JJ., concur.*